236 F.3d 749 (D.C. Cir. 2001)
 Utility Solid Waste Activities Group, et al., Petitioners
v.
Environmental Protection Agency and Carol M. Browner, Administrator, United States Environmental Protection Agency, Respondents
 No. 99-1372 & 99-1374
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued October 13, 2000
Decided January 30, 2001
 
 On Petitions for Review of an Order of the Environmental Protection Agency
 Angus Macbeth argued the cause for petitioners. With him on the briefs were Christopher L. Bell, Patricia K. Casano, Douglas H. Green, John L. Moore, Jr. and Heather E. Gange.
 Daniel M. Flores, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the briefs was Lois J. Schiffer, Assistant Attorney General. Christopher S. Vaden, Attorney, U.S. Department of Justice, entered an appearance.
 Before: Williams, Randolph, and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Randolph.
 Randolph, Circuit Judge:
 
 
 1
 Utility Solid Waste Activities Group and General Electric petition this court to vacate in part an alteration of the Environmental Protection Agency's rules regulating the use of porous substances contaminated by polychlorinated biphenyls ("PCBs"). PCBs are outstanding insulators and do not burn easily-characteristics that make them useful in transformers, capacitors, and other electrical equipment. PCBs are also carcinogenic and toxic, and may cause immune system suppression, liver damage, endocrine disruption in humans and animals and skin irritation. These dangers are compounded by the remarkable stability of PCB compounds, which bioaccumulate in fatty tissue and are readily absorbed through the skin and respiration, as well as through ingestion of animals exposed to PCBs.
 
 
 2
 In the 1976 Toxic Substances Control Act ("TSCA"), Con- gress singled out these chemicals for special treatment. 15 U.S.C. §§ 2601, 2605(e). The Act forbid the "manufacture, processing, distribution in commerce or use" of any PCB except in a "totally enclosed manner." 15 U.S.C. § 2605(e)(2)(A). The EPA Administrator had authority to waive the restriction by rule but only if it
 
 
 3
 would not present an unreasonable risk of injury to health or the environment. 15 U.S.C. § 2605(e)(2)(B). We are told that by January 1, 1978, when these measures took effect, nearly all manufacturing of PCBs had ceased.
 
 
 4
 In 1987 EPA published a PCB Spill Policy establishing cleanup and decontamination standards for spills of PCBs at concentrations of greater than or equal to (">") 50 parts per million ("ppm") that occurred after May 3, 1987. 40 C.F.R. §§ 761.120-761.135.[1] Under the Spill Policy, solid surfaces, including concrete, which were cleaned to a surface concentration of 10 micrograms of PCBs per 100 square centimeters ("10 µg/100 cm2") could be used without restrictions. See, e.g., 40 C.F.R. § 761.125(b)(1)(i), (c)(4)(ii). The Spill Policy, including the 10 µg/100 cm2 surface standard, remains in effect today.
 
 
 5
 On June 29, 1998, EPA promulgated major amendments to the PCB regulations ("PCB Mega Rule"). 63 Fed. Reg. 35,384 (1998). This PCB Mega Rule set forth an additional option for spills of (">") 50 ppm PCBs onto concrete, provided that the concrete could be "decontaminated" by cleaning to 10 µg/100 cm2 PCBs, if the decontamination began within 72 hours of the spill. 40 C.F.R. § 761.79(b)(4).[2] After promul- gation of the PCB Mega Rule, porous surfaces contaminated by spills of (">") 50 ppm PCBs could be used without restrictions if they had been cleaned up in accordance with the PCB Spill Policy or decontaminated in accordance with § 761.79. See 40 C.F.R. §§ 761.20(c)(5) and 761.30(u).
 
 
 6
 During the development of the PCB Mega Rule, the ques- tion whether PCB contaminated surfaces that did not meet the cleanup or decontamination standards could be used was the subject of extensive public comment and inquiry by EPA. See 63 Fed. Reg. at 35,398; Informal Public Hearing Disposal of Polychlorinated Biphenyls (June 6-7, 1995), at 87-88, 100-01; Comments of Chemical Manufacturers Association, USWAG and NEMA on proposed PCB Mega Rule at 26-28; EPA Response to Comments Document at 41 (May 1998). Commenters pointed out that, under EPA's interpretation of the TSCA, buildings with PCB-contaminated porous surfaces (e.g., with concrete or wooden walls or floors) could not be used, even if the risks from exposure were trivial, unless the contaminated surfaces were removed. Id.
 
 
 7
 Responding to these comments, EPA promulgated 40 C.F.R. § 761.30(p) to authorize the continued use of porous surfaces contaminated by spills of PCBs "regulated for dis- posal" (i.e., PCBs at concentrations (">") 50 ppm), provided certain cleaning, painting and marking conditions were met.[3]
 
 
 8
 The scope of § 761.30(p) established by the PCB Mega Rule was:
 
 
 9
 (p) Continued use of porous surfaces contaminated with PCBs regulated for disposal by spills of liquid PCBs.[4]
 
 
 10
 (1) Any person may use porous surfaces contaminated by spills of liquid PCBs at concentrations of (">") 10 µg/100 cm2 for the remainder of the useful life of the surfaces and subsurface material if the following conditions are met:....
 
 
 11
 40 C.F.R. § 761.30(p) (1998). Under this provision, the re- quirements in § 761.30(p)-i.e., the cleaning, painting and marking requirements-were triggered when (1) a porous surface was contaminated by a spill of PCBs "regulated for disposal" (i.e., concentrations (">") 50 ppm PCBs), and (2) the spill resulted in a PCB surface concentration of greater than 10 µg/100 cm2. EPA explained:
 
 
 12
 EPA agrees with comments that the removal of porous materials contaminated by spills of liquid PCBs is eco- nomically burdensome and unnecessary where release of and exposure to the PCBs can be controlled. EPA believes that the use conditions specified in § 761.30(p) will effectively prevent exposure to any residual PCBs in the contaminatedporous material and therefore continued use of this material will not present an unreasonable risk.
 
 
 13
 63 Fed. Reg. at 35,398. In other words, surfaces that were contaminated at PCB concentrations (">") 10 µg/100 cm2 did not pose an unreasonable risk if they were cleaned, painted and marked in accordance with § 761.30(p). Unlike the Spill Policy and the concrete decontamination provision, cleanup did not have to occur within a set time period. Compare 40 C.F.R. § 761.79(b)(4) and 40 C.F.R. § 761.125(b)(1)(iii), (c)(1); see also supra note 2.
 
 
 14
 On June 24, 1999, without notice and comment, EPA amended the PCB Mega Rule. EPA called the changes minor technical amendments. 64 Fed. Reg. at 33,756. The amendment challenged here repealed the threshold criterion in § 761.30(p)(1) that PCBs had to be present on the porous surface at a surface concentration of (">") 10 µg/100 cm2 to trigger the exposure controls. The revised text of § 761.30(p)(1) reads as follows:
 
 
 15
 (p) Continued use of porous surfaces contaminated with PCBs regulated for disposal by spills of liquid PCBs.
 
 
 16
 (16) Any person may use porous surfaces contaminated by spills of liquid PCBs at concentrations (">") 50 ppm for the remainder of the useful life of the surfaces and subsurface material if the following conditions are met....
 
 
 17
 40 C.F.R. § 761.30(p)(1) (emphasis added).
 
 
 18
 The original triggers for § 761.30(p) were a PCB concen- tration per unit of volume spilled (i.e., (">") 50 ppm) that resulted in a PCB surface concentration per unit of area (i.e., 10 µg/100 cm2). The new trigger is now based solely on the PCB concentration in the material spilled. The resulting surface concentration and potential exposure level thus be- came immaterial.
 
 I.
 
 19
 The Administrative Procedure Act's general rulemaking section, 5 U.S.C. § 553, sets down certain procedural requirements with which agencies must comply in promulgating legislative rules: there must be publication of a notice of proposed rulemaking; opportunity for public comment on the proposal; and publication of a final rule accompanied by a statement of the rule's basis and purpose. See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 523-24 (1978). That EPA did not comply with the notice and comment requirements of APA § 553 in amending § 761.30(p) is certain. The question is whether EPA's justifications for not doing so will save the amended rule.
 
 A.
 
 20
 EPA represents to us that it altered § 761.30(p) in order to correct language resulting from an erroneous use of the Word Perfect find/replace command in the drafting of the regulation. Declaration of Dr. John H. Smith at 2 (June 23, 2000). We will accept this explanation. The question remains whether EPA needed to comply with the APA in making the correction. EPA thinks not because it possesses "inherent power" to correct "technical errors." It relies on a line of cases beginning with American Trucking Ass'ns v. Frisco Co., 358 U.S. 133 (1958), for the proposition that agencies may correct their mistakes without complying with the APA's procedural requirements. Our court has never recognized such an "inherent power" in the rulemaking context, and we decline to do so now.
 
 
 21
 The Supreme Court decision just cited dealt with the Interstate Commerce Commission's approval of the acquisition, by a wholly-owned subsidiary of a railroad, of operating rights of several motor carriers. Id. at 135. When the
 
 
 22
 Commission later issued certificates of public convenience and necessity, it failed to include language present in its reports reserving to the Commission the power toimpose restrictions and modifications. Id. at 137. The Commission discovered the oversight, reopened the acquisition proceedings, gave notice to the parties and, after further proceedings in which the parties
 
 
 23
 participated, ordered the certificates modified to reflect this limitation. Id. at 137-38. The Supreme Court affirmed the order. The Court noted that Fed. R. Civ. P. 60(a) grants courts the power to correct clerical errors, and held that the Commission possessed the same power by analogy and pursuant to its broad enabling statute instructing the Commission to serve the "ends of justice." 358 U.S. at 145. "To hold otherwise would be to say that once an error has occurred the Commission is powerless to take remedial steps." Id. Later decisions, using the same analogy to judicial proceedings, have sustained an agency's inherent power to correct errors in an adjudication. See Howard Sober, Inc. v. ICC, 628 F.2d 36, 31-42 (D.C. Cir. 1980); United States v. Civil Aeronautics Bd., 510 F.2d 769, 772-76 (D.C. Cir. 1975); City of Long Beach v. Department of Energy, 754 F.2d 379, 387-88 (Temp. Emer. Ct. App. 1985).
 
 
 24
 The judicial analogy does not work here. This was not an adjudication. EPA acted in a quasi-legislative fashion. The rule as initially promulgated was legislative in nature. Congress, with some regularity particularly in the tax area, makes technical corrections to legislation, but it does so by enacting corrective legislation, not by issuing an order announcing the change. EPA is
 
 
 25
 not quite so constrained. APA § 553(b)(B) permits it, and other agencies, to dispense with notice and comment "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Unlike the Frisco Supreme Court case, the alternative here is not that EPA would be powerless to correct its mistakes. It has the power to do so, so long as it follows certain procedures, either those spelled out in APA § 553(b) for usual notice and comment rulemaking, or in the exception we have just quoted from APA § 553(b)(B).
 
 
 26
 In Edison Electric Institute v. OSHA, 849 F.2d 611, 622 (D.C. Cir. 1988), the government agreed with petitioners that OSHA's failure to include an exception for utilities to a general rule was the result of a ministerial error. Rather than amending the regulation, OSHA achieved the same result by issuing a memorandum instructing those responsible for enforcing the rule to forbear applying it to utilities. Id. The court held that this binding pronouncement interpreting the rule was sufficient to correct the error without an additional round of notice and comment rulemaking. Id.[5] EPA reads Edison Electric to mean that an agency may dispense with notice and comment procedures and change rules to correct ministerial errors. We think this is wrong for four reasons. First, OSHA did not alter or amend the rule itself. It simply instructed its regional offices not to enforce it against utilities. Second, OSHA did so because-as the parties agreed-the rule was not intended to apply to utilities. Third, the memorandum setting forth this instruction did not have to be preceded by notice and comment rulemaking.[6] Fourth, to hold that an agency may correct errors in rules merely by announcing a change would be inconsistent with APA § 553(b)(B).
 
 
 27
 While Edison Electric is distinguishable, Chlorine Institute, Inc. v. OSHA, 613 F.2d 120, 123 (5th Cir. 1980), seems not to be.[7] In that case the Fifth Circuit permitted OSHA to correct a ministerial error in a regulation seven years after its promulgation. Without explaining why, the court relied on the Supreme Court's Frisco decision. We reject this view as unsupported by the reasoning of Frisco, and as inconsistent with the APA, which contains clear and limited exceptions to the requirements of notice and comment.
 
 B.
 
 28
 In addition to its claim of inherent power to correct mis- takes in rules, EPA contends that it brought itself within one or more of the APA's exceptions to notice and comment rulemaking.
 
 
 29
 APA § 553(b) requires notice of any proposed rule to be published in the Federal Register "unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b). EPA's argument is that petitioners received "actual notice" when EPA published the change on its Internet site and when it held a meeting attended by counsel for Utility Solid Waste Activities Group. This court has never found that Internet notice is an acceptable substitute for publication in the Federal Register, and we refuse to do so now. See Appalachian Power Co. v. EPA, 208 F.3d 1015, 1020 (D.C. Cir. 2000). In any event, EPA has not even alleged that the petitioners were "named" in the Internet publication, as APA § 553(b) would require if this sort of notice were sufficient. See Rodway v. Department of Agric., 514 F.2d 809, 815 (D.C. Cir. 1975). That counsel for one of the petitioners attended a meeting discussing the modification of § 761.30(p) is irrelevant. The other petitioner, General Electric, did not attend. See MCI Telecomm. Corp. v. FCC, 57 F.3d 1136, 1143 (D.C. Cir. 1995). EPA thus failed to provide petitioners with "actual notice."
 
 
 30
 EPA also thinks it qualified for the exception to notice and comment rulemaking contained in APA § 553(b)(B) ("when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest"). The claim is that its statement in the Federal Register accompanying the amendment-the amendments contained only "minor, routine clarifications that will not have a significant effect on industry or the public"-amounted to a finding of good cause and a statement of reasons. There are three grounds in APA § 553(b)(B) for finding good cause: notice and comment would be "impracticable, unnecessary, or contrary to the public interest." EPA does not tell us which of the three it meant to invoke, so we will discuss each. In doing so we are mindful of our precedents that the "good cause" exception is to be "narrowly construed and only reluctantly countenanced." Tennessee Gas Pipeline Co. v. FERC, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C. Cir. 1980)). The exception is not an "escape clause"; its use "should be limited to emergency situations." American Fed'n of Gov't Employees v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981).
 
 
 31
 With respect to "impracticable" ground, the Attorney General's Manual explains "that a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in [§ 553]," as when a safety investigation shows that a new safety rule must be put in place immediately. United States Departmentof Justice, Attorney General's Manual on the Administrative Procedure Act 30-31 (1947); see also Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1236-37 (D.C. Cir. 1994); Petry v. Block, 737 F.2d 1193, 1201 (D.C. Cir. 1984). This ground for finding good cause cannot possibly apply here. There is no indication that 40 C.F.R. § 761.30(p), as it stood before the amendment, posed any threat to the environment or human health or that some sort of emergency had arisen. And EPA made no finding to this effect.
 
 
 32
 With respect to the "unnecessary" prong of the exception, one court has ruled that its use is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." South Carolina v. Block, 558 F. Supp. 1004, 1016 (D.S.C. 1983) (internal quotations omitted); see also Texaco, Inc. v. FPC, 412 F.2d 740, 743 (3d Cir. 1969). This formulation comports with the explanation in the Attorney General's Manual that " '[u]nnecessary' refers to the issuance of a minor rule in which the public is not particularly interested." Attorney General's Manual at 31. EPA's amendment of 40 C.F.R. § 761.30(p) does not fit that mold. As amended, the rule greatly expanded the regulated community and increased the regulatory burden. In the original rule, porous surfaces contaminated by spills containing (">") 50 ppm PCBs were not regulated by § 761.30(p) if the resulting PCB surface contamination was less than 10 µg/100 cm2. As we understand the new regulations, these same surfaces now became subject to § 761.30(p) because the 10 µg/100 cm2 surface contamination trigger has been repealed. While there may be other possible readings of this complex regulatory scheme, we need not reach them. EPA's amendment was, without doubt, something about which these members of the public were greatly interested.
 
 
 33
 As to the "public interest" ground for finding good cause, the Attorney General's Manual states that this "connotes a situation in which the interest of the public would be defeated by any requirement of advance notice," as when announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent. Attorney General's Manual at 31; see also Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1484 n.2 (9th Cir. 1992); Levesque v. Block, 723 F.2d 175, 184-85 (1st Cir. 1983). Nothing of the sort is present here and nothing EPA said in promulgating the amendment suggested that it needed to forego notice and comment in order to prevent the amended rule from being evaded.
 
 
 34
 We therefore hold that EPA cannot take advantage of the exceptions contained in APA § 553(b)(B).
 
 
 35
 We hold as well that EPA cannot be excused from compliance with § 553 on the basis that its failure to engage in notice and comment rulemaking amounted to harmless error. This seems to us merely another way of saying that the change in the rule was unimportant, having no significant impact. We have already rejected that position. If EPA means instead that its error in not conducting notice and comment rulemaking prejudiced no one, we disagree. Petitioners have presented enough to show that on remand they can mount a credible challenge to the amended rule and were thus prejudiced by the absence of an opportunity to do so before the amendment.
 
 
 36
 The amendment to 40 C.F.R. § 761.30(p), as set forth in the June 1999 Federal Register, constituted agency action "without observance of [the] procedure required by law" and, as such, it is "unlawful and set aside." 5 U.S.C. § 706(2)(D).
 
 
 37
 Accordingly, the petitions for judicial review are granted.
 
 
 
 Notes:
 
 
 [1]
 The PCB Mega Rule states that regulatory provisions applying to PCBs at concentrations (">") 50 ppm also apply to surfaces contaminated with PCBs at surface concentrations (">") 10 µg/100 cm2. 40 C.F.R. § 761.1(b)(3).
 
 
 [2]
 There are certain differences between this decontamination provision and the Spill Policy. The former is available only for spills onto concrete and includes a different response time (72 hours as opposed to 48 hours in the Spill policy). Compare 40 C.F.R. § 761.79(b)(4) and 40 C.F.R. § 761.125(b)(1)(iii), (c)(1). Both, however, use the 10 µg/100 cm2. surface cleanup standard. Further, the Spill Policy is an enforcement policy, not a regulation. 40 C.F.R. § 761.135.
 
 
 [3]
 The use conditions in § 761.30(p), including the cleaning, marking and painting requirements, are set forth at 40 C.F.R. § 761.30(p)(1)(i)-(iii).
 
 
 [4]
 Spills of PCBs at concentrations (">") 50 ppm "constitute the disposal of PCBs" and are regulated under EPA's PCB program (referred to as PCBs "regulated for disposal"). See 40 C.F.R. § 761.50(a)(4).
 
 
 [5]
 The court dropped a cf. citation to Howard Sober, Inc. v. ICC, 628 F.2d 36, 41-42 (D.C. Cir. 1980), a case applying the ministerial error exception in the adjudication context.
 
 
 [6]
 There was no claim in Edison Electric that the enforcement directive was "so extreme as to amount to an abdication" of the agency's regulatory responsibility. See Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985).
 
 
 [7]
 We say "seems" because the court, after pointing out some of the differences between correcting an error in a regulation rather than an adjudication, stated that the parties had not discussed the subject. 613 F.2d at 123 n.6. The court therefore may have meant merely to assume that ministerial errors in regulations can be corrected without an additional rulemaking. Chlorine may also be explained on the basis that the regulation contained an internal conflict and that the statute provided a rule of decision in such instances, requiring adherence to the stricter of the two standards in the regulation. On that view of the case, no additional rulemaking would have been necessary. The statute took care of the error.