# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 16, 2011   Decided November 18, 2011

No. 10-1184

VERMONT PUBLIC SERVICE BOARD AND MAINE PUBLIC
UTILITIES COMMISSION,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

QWEST COMMUNICATIONS INTERNATIONAL INC., ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the Federal
Communications Commission

———

*James Hardwick Lister* argued the cause for petitioners. With him on the briefs were *Elisabeth H. Ross*, *David Edward Lampp*, *Andrew Hagler*, *Lisa C. Fink*, and *Paul Stern*, Deputy Attorney General, Office of the Attorney General for the State of Maine. *Joel B. Shifman* entered an appearance.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys.

U.S. Department of Justice, *Austin C. Schlick*, General Counsel, Federal Communications Commission, *Peter Karanjia*, Deputy General Counsel, *Richard K. Welch*, Acting Associate General Counsel, and *James M. Carr*, Counsel. *Daniel M. Armstrong III*, Associate General Counsel, Federal Communications Commission, entered an appearance.

*Helgi C. Walke*r argued the cause for intervenors Verizon and NASUCA. With her on the brief were *Brett A. Shumate*, *Michael E. Glover*, *Edward Shakin*, *Christopher M. Miller*, *John T. Scott III*, and *David Bergmann. Christopher J. White* entered an appearance.

Before: HENDERSON, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Pursuant to the Telecommunications Act of 1996, the Federal Communications Commission, through its Universal Service Program, provides subsidies to ensure that low-income consumers, schools, health care providers, and libraries have access to advanced telecommunications services and that rates and services in rural areas are "reasonably comparable" to rates and services in urban areas. In this case, we review a Commission order declining to increase subsidies under the rural rates and services component of the Universal Service Program. Because the Commission's decision is neither arbitrary nor capricious, we deny the petition for review.

## I.

The Telecommunications Act of 1996, 47 U.S.C. § 254(b), adopted six basic principles of "universal service."

These principles instruct the Commission and the several states to jointly "base policies for the preservation and advancement of universal service" on:

(1) Quality and rates. Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services. Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high cost areas. Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions. All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms. There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries. Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services . . . .

47 U.S.C. § 254(b).

Pursuant to these statutory directives, the Commission established the Universal Service Program, which consists of four separate funds: 1) low-income support, which subsidizes rates for individuals that might not otherwise be able to afford basic telephone services; 2) rural health care support, which subsidizes the costs of communications services health providers need to offer medical services in rural areas; 3) schools and libraries support, which funds the costs of phone services and Internet access for educational institutions and libraries; and 4) high-cost support—the fund at issue in this case—which supports the provision of services in high-cost areas. *See* Federal-State Joint Board on Universal Service, *Universal Service Monitoring Report*, CC Dkt. No. 98-202, at 1-34 (2010).

The Program is financed by fees charged to telephone companies and other providers of interstate telecommunications services. *See* 47 C.F.R. § 54.706. Telecommunications providers may pass these fees along to their customers, and almost always do, usually through line items on bills marked "Federal Universal Service Assessment." *See High Cost Universal Support Order on Remand*, 25 FCC Rcd. 4072, 4083-84 ¶ 21 (2010) (*"Order"*). Thus, nearly every purchaser of telephone services in America helps support the Program.

The past decade has seen a dramatic increase in annual disbursements made pursuant to the Program, and a corresponding increase in the surcharge levied on consumers. In 2001, the Commission disbursed $5.35 billion in support of universal service; by 2009, that number had risen to $7.26 billion. *Order*, 25 FCC Rcd. at 4082 ¶ 20. By early 2010,

disbursements amounted to 15.3 percent of telecommunications companies' interstate and international revenue, requiring "many consumers [to] pay[] a surcharge of over 15 percent on the interstate portion of their monthly bill." *Id.* at 4083 ¶ 21. The high-cost support fund is by far the Program's most expensive component. In 2009, total expenditures under that fund totaled $4.3 billion of the $7.26 billion Program. *Id.* at 4082 ¶ 20.

This case concerns a single feature of the high-cost support fund: subsidies the Commission gives to telecommunications companies that provide landlines—wireless is not covered—in rural areas. Absent these subsidies, landline customers in rural areas would generally pay higher rates for telephone services than customers in urban areas. This is so because it is generally more expensive to provide landline phone service in less-populated areas, where customers are geographically dispersed. Given this, the Commission provides support to "non-rural" telecommunications providers (i.e., large telecommunications companies serving both rural and urban areas) to subsidize their costs of providing landlines in rural areas. These subsidies are provided in order to carry out Congress's directive to ensure "reasonably comparable" rates between rural and urban areas. Precisely what constitutes "reasonable" comparability is a definitional matter left to the Commission's discretion, *see Rural Cellular Ass'n v.* FCC, 588 F.3d 1095, 1101-02 (D.C. Cir. 2009), and it is the Commission's definition of this statutory term that lies at the heart of this case.

In 2003, following litigation in the Tenth Circuit not directly relevant here, *Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) (*Qwest I*), the Commission defined "reasonably comparable" as requiring rural rates to fall within

a nationwide *range* of urban rates. *Federal-State Joint Board on Universal Service*, 18 FCC Rcd. 22559, 22583 ¶ 39. The Commission selected the range benchmark because both urban and rural rates vary significantly from state to state, "in large part because states base rates on a variety of different policies." *Id.* at 22584 ¶ 40. Moreover, when the Telecommunications Act was passed in 1996, "urban residential rates ranged from $13.04 to $30.62 and the average urban rate was $20.01." *Id.* Suspecting it "reasonable to assume that Congress was aware of the variability of urban rates when it enacted the 1996 Act," the Commission did not "believe that Congress would have required rural rates to be any closer to the average urban rates than other urban rates." *Id.* For this reason, the Commission opted to use standard deviation analysis, rather than a percentage or dollar amount, to define "reasonably comparable" rates between rural and urban areas. Standard deviation measures the variation, or dispersion, from the average value.

The Commission defined "reasonably comparable" as requiring rural area rates to fall within two standard deviations of the average national urban rate. *Id.* at 22608-09 ¶ 81. This meant that in order to be "reasonably comparable," a rural rate would have to fall within a range encompassing 95% of the individual urban rates, which the Commission would collect by conducting an annual survey of 95 cities. *Id.* at 22607-09 ¶¶ 80-81. To ensure that the federal government and the states were both fulfilling their statutory mandate to achieve "reasonably comparable" rates, the Commission required that states annually certify that their rural rates were "reasonably comparable" to urban rates as measured by the Commission's two-standard-deviation definition. *Id.* at 22601-02 ¶ 70.

To help achieve "reasonable comparability" of rural and urban rates, the Commission created the support mechanism at issue here. Under that mechanism, telecommunications carriers serving rural areas are eligible to receive a subsidy totaling 76% of the amount that the statewide average cost per line exceeds two standard deviations above the national average cost per line. *Id.* at 22630 ¶ 125. For example, if two standard deviations above the national average cost per line was $25 and the state's average cost per line was $30, telecommunications carriers within a state would receive a subsidy of $3.80 per line—or 76% of the $5.00 difference between the state's average cost per line and the national average cost per line.

The Commission based its support mechanism on costs, rather than rates, to avoid creating incentives for carriers to charge higher rates in the expectation that such rates would be subsidized by the federal government. *See id.* at 22572 ¶ 23. The Commission disbursed funds based on *statewide* average costs, as opposed to costs in other pre-defined "areas," to encourage states to require telephone service providers to average rates within their borders—i.e., to charge higher rates to urban customers and use the excess funds to lower rural rates. *Id.* at 22573 ¶24. Most states have since adopted statewide averaging policies, and these policies have resulted in much higher rural rates in predominantly rural states like Vermont ($30.73 per line) than in states where rural rates are subsidized by large cities (for example, $14.14 per line in Texas). *Order*, 25 FCC Rcd. at 4133-34, app. C.

Following the Commission's promulgation of its 2003 order, several rural states—including Vermont, Maine, and Wyoming—petitioned the Tenth Circuit for review of that order. *Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222 (10th Cir. 2005) (*Qwest II*). In *Qwest II*, the Tenth Circuit

identified several defects in the Commission's order. To begin with, it ruled that the Commission had failed to support its definition of "reasonably comparable" rural rates—rates falling within a range comprised of 95% of urban rates—with sufficient empirical data. *Id.* at 1239. In particular, the court criticized the Commission for focusing exclusively on the comparability of urban and rural rates in 1996, when the Telecommunications Act was passed. *Id.* at 1235. This backwards-looking orientation, the court found, failed to explain how the Commission's definition would, as required by the Telecommunications Act, both "preserve *and advance*" universal service. *Id.* at 1235-36 (emphasis added); *see also* 47 U.S.C. § 254(b)(4)–(5). According to the court, this defect also infected the two-standard-deviation funding mechanism. The court further instructed the Commission to explain how the high-cost support mechanism comports with all of the guiding principles in the Telecommunications Act, including its requirement that "*services*" be "reasonably comparable" across rural and urban areas, as well as that they be made available at "affordable rates." *Id.* at 1234 (citing 47 U.S.C. § 254(b)(1)). Significantly for our purposes, however, the court never vacated the 2003 funding mechanism, and the Commission has continued using it ever since.

Before the Commission had an opportunity to respond to *Qwest II*, Congress passed the Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009). As part of that Act, Congress directed the Commission to "ensure that all people of the United States have access to broadband capability." *Id.* § 6001(k)(2), 123 Stat. at 516. The term "broadband" refers to a telecommunications signal of greater bandwidth than a traditional signal, thus allowing for faster Internet connection speeds and a greater capacity for traffic, including voice communications. In response, the Commission adopted the

National Broadband Plan in 2010. There, it laid out a roadmap for future rulemaking that would lead to the establishment of policies in support of Congress's directive to ensure universal broadband access. *See* Federal Communications Commission, *Executive Summary* of National Broadband Plan: Connecting America (2010), *available at* http://www.broadband.gov/plan/executive-summary. Among other things, the National Broadband Plan recommends "a comprehensive reform program to shift the high-cost universal service program from primarily supporting voice communications to supporting broadband platforms that enable many applications, including voice." *Order*, 25 FCC Rcd. at 4114 ¶ 79.

Later in 2010, the Commission issued a "narrow" order "respond[ing] to the Tenth Circuit's remand" in *Qwest II*. *Order*, 25 FCC Rcd. at 4073 ¶ 1. The Commission began by emphasizing the significant changes that had occurred in the telecommunications marketplace over the preceding decade. In particular, large numbers of customers had "migrat[ed] away from traditional wireline telephone service," replacing their landline phones with wireless phones. *Id.* at 4078-79 ¶ 14. In addition, and as Congress recognized when it directed the Commission to ensure wider broadband access, customers in some areas of the country had the option to purchase voice services from broadband-based Internet providers, although "these services are not yet as pervasive as traditional wireline or wireless services." *Id.* at 4080 ¶ 17. And explaining that it had "insufficient time . . . to implement [the] reforms to the high-cost universal service mechanisms" mandated by the National Broadband Plan, the Commission stated it would "soon release a notice of proposed rulemaking that sets the stage for comprehensive reform of the high-cost universal service mechanism as recommended in . . . the National Broadband Plan." *Id.* at 4114 ¶ 80.

Turning to the Tenth Circuit's remand order, the Commission, this time providing additional explanation, readopted its "reasonably comparable" benchmark—that a rural rate is "reasonably comparable" if it falls within two standard deviations of the national average urban rate. *Id.* at 4101 ¶ 53. In response to the court's instruction that any definition of "reasonably comparable" must both "preserve and advance universal service," the Commission pointed out that telephone subscriber rates had increased since the passage of the Telecommunications Act, and had continued increasing since the Commission required states to certify "reasonable comparability" of urban and rural rates as measured by the definition it had adopted in 2003. *Id.* at 4102-03 ¶¶ 56-57. Indeed, telephone subscriber rates were at an all-time high, including in rural areas. *Id.* at 4101 ¶ 54. Accordingly, the Commission concluded that the two-standard-deviation definition had actually helped advance universal service. Because of this, the Commission found that its definition of "reasonably comparable" satisfied the Telecommunications Act's mandate to preserve and advance universal service.

Then, responding to the Tenth Circuit's direction that the Commission support its two-standard-deviation rule with empirical data, the Commission cited a range of information showing that rural rates are in fact reasonably comparable to urban rates:

- Rural and urban rates are typically similar within state boundaries, e.g., customers in Boston pay approximately the same rates as customers in rural Massachusetts. *See id.* at 4095-96 ¶ 43.
- The national average rural rate is only marginally higher than the national average urban rate. *Id.*

- The *range* of rates does not vary as a function of urbanization—in other words, the differences among urban rates are similar to the differences among rural rates. *Id.* at 4096-98 ¶¶ 44-46.

Based on this data, the Commission concluded that its current system was working. Responding to comments from several states, including Vermont and Maine, calling on the Commission to increase subsidies to telecommunications providers in rural states, the Commission noted that such proposals "would significantly increase the size of the fund . . . and the amount that end users ultimately pay." *Id.* at 4093 ¶ 38. Accordingly, the Commission "decline[d] to add to the already heavy universal service contribution burden placed on consumers." *Id.*

Next, the Commission responded to the Tenth Circuit's directive that it explain how its high-cost support mechanism ensures, as required by the Act, comparable *services* (as opposed to rates) between rural and urban areas. *See Qwest II*, 398 F.3d at 1234 (citing 47 U.S.C. § 254(b)(1)). The Commission noted that nearly every household in America (between 95.7 and 98.2%, depending on the metric used) subscribes to either landline or wireless telephone service. *Order*, 25 FCC Rcd. at 4080-81 ¶ 18. Moreover, both rural and urban customers have access to wireless services and Internet-based phone services offered by companies like Vonage and Skype. *Id.* at 4079-80 ¶¶ 15-17. Indeed, "[e]ven in rural areas, approximately 98.5 percent of the population has access to mobile services offered by one or more providers." *Id.* at 4079 ¶ 15. Thus, the Commission concluded that services were reasonably comparable between urban and rural areas.

That said, the Commission acknowledged that in some states the combination of federal and state action might be failing to produce "reasonably comparable" rates or services. To deal with such situations, the Commission adopted a waiver procedure under which individual states could present the Commission with "documentation that unique circumstances prevent the achievement of reasonably comparable rates in that state." *Id.* at 4100 ¶ 51. Were a state to make such a showing, the Commission explained, it "can provide appropriate relief," including a grant of supplemental high-cost support to a state. *Id.* ¶¶ 50-51. Pursuant to the waiver program, one state—Wyoming—applied for additional funding. *Id.* ¶ 50. In response, and in a separate Memorandum Opinion and Order, the Commission concluded that Wyoming had demonstrated that concurrent state and federal action had failed to produce rural rates that were reasonably comparable to urban rates. *See id.* at 4116-20 ¶¶ 84-92. To correct the problem, the Commission granted Wyoming more than $2 million in annual supplemental high-cost support. *Id.* at 4120 ¶ 90.

Instead of seeking a waiver, the Vermont Public Service Board and the Maine Public Utilities Commission filed the instant petition for review.

## II.

We begin with Vermont's contention that *Qwest II* expressly directs the Commission to revise its two-standard-deviation high-cost support mechanism. Vermont misreads *Qwest II*. Nowhere does that decision say that the Commission's high-cost support mechanism is *per se* invalid. Instead, *Qwest II* invalidates the high-cost support mechanism only insofar as it rested on an invalid definition of "reasonably comparable" rates. *Qwest II,* 398 F.3d at 1237. ("*In that* the non-rural, high-cost support mechanism

contained in the Order on Remand rests on the application of the definition of 'reasonably comparable' rates invalidated above, it too must be deemed invalid.") (emphasis added). Nor does *Qwest II* rule that the Commission's underlying definition of "reasonably comparable" was *per se* impermissible. Indeed, the opinion observes that the Commission's use of the two-standard-deviation definition of "reasonably comparable" has a "certain logic." *Id.* But absent empirical evidence that the Commission's "reasonably comparable" definition fulfilled its concurrent duties to "preserve and advance" universal service, the definition was "rendered untenable." *See id.* Thus, nothing in *Qwest II* prevents the Commission from re-adopting the same definition of "reasonably comparable," or the same high-cost support mechanism. *Qwest II* merely directs the Commission to explain how its definition of "reasonably comparable" fulfills the statutory mandate to both "preserve and advance" universal service. The Commission's decision to re-adopt the same definition of "reasonably comparable"—and the corresponding high-cost support mechanism—would run afoul of *Qwest II* only to the extent the Commission still fails to explain how its program complies with the Telecommunications Act.

Vermont primarily challenges the Commission's reliance on data showing (1) that the definition of "reasonably comparable" it adopted in 2003 has in fact advanced services in rural areas, and (2) that the high-cost support mechanism has in fact produced "reasonably comparable" rates. According to Vermont, the Commission's use of statistics showing that average rural and urban rates are comparable— both within states and as a nationwide average—failed to account for the fact that most states already "average" rates by requiring telephone providers to charge higher rates to urban customers, using the excess funds to lower rural rates.

Vermont also challenges the Commission's citation to high telephone subscribership rates in rural areas, arguing that demand for telephone service is "highly inelastic," Appellants' Br. 29 (quoting *Allocation of Costs Associated with Local Exchange Carrier Provision of Video Programming Services*, Notice of Proposed Rulemaking, 11 FCC Rcd. 17211, 17227 ¶ 41 (1996)), and that telephone subscription levels change little with increasing rates. We find nothing arbitrary or capricious in the Commission's use of these metrics.

To begin with, the Commission's focus on intrastate rural and urban rates was entirely in accordance with the Telecommunications Act. The Act requires reasonable comparability between rural and urban "areas" and "regions"; contrary to Vermont's contentions, nothing in the Act requires reasonable comparability of rates among states. Indeed, the Tenth Circuit vacated a previous Commission standard because it focused exclusively on interstate rate comparability, instructing the Commission to develop mechanisms to ensure that states would "preserve and advance universal service" within their borders. *Qwest I,* 258 F.3d at 1204. The Commission did just that and, since 2003, has required states to certify "reasonable comparability" of rural-to-urban rates within their borders as a condition for receiving federal funds. 18 FCC Rcd 22559 ¶ 92**.** It is in accordance with this certification process that many states continue to "average" rural and urban rates. The Commission, tasked by the Tenth Circuit with demonstrating that the high-cost support mechanism preserves and advances universal service in rural areas, reasonably cited data showing the mechanism's intrastate effects.

As to the Commission's citation to data showing that national average urban rates are comparable to national

average rural rates, Vermont argues that this comparison fails adequately to reflect high rural rates in states like Vermont because those higher rates are counterbalanced in the national average by low rural rates in states with large urban centers, like Texas. But the Commission did not consider the national average rates in isolation. It also considered the range of individual urban and rural rates and determined that, although some urban rates and some rural rates are very high, the range of rural and urban rates "does not vary greatly." *See Order,* 25 FCC Rcd. at 4096-98, ¶44-46**.** This conclusion should obviate Vermont's concern.

Finally, by citing high rural telephone subscriber rates, the Commission was seeking to disprove a negative: that rates had become so disparate that they were affecting customer purchasing decisions. In so doing, the Commission was directly responding to the Tenth Circuit's fear that "if rates are too high, the essential telecommunications services encompassed by universal service may indeed prove unavailable." *Qwest II*, 398 F.3d at 1236. So even if demand for telephone services is highly inelastic, the Commission's response to the Tenth Circuit was neither arbitrary nor capricious.

Vermont next contends that the Commission failed to address alternative rural-cost benchmarks above which support would be paid under the high-cost support program. In its comments on the proposed rule, Vermont called on the Commission to subsidize telecommunications providers if a state's cost per line exceeded 125% of the cost per line in Washington, D.C.—selected as a representative urban area— as opposed to the current two-standard-deviation benchmark. *See Order*, 25 F.C.C. Rcd. at 4130-31, app. B. The Washington, D.C. alternative would have yielded an $18.65 benchmark. *Id.* at 4131. In its final rule, however, the

Commission expressly considered and rejected the Washington, D.C. benchmark, explaining not only that "the non-rural high-cost mechanism already provides sufficient support," but also that it wanted to avoid "add[ing] to the already heavy universal service contribution burden placed on customers." *Id.* at 4093 ¶ 38.

According to Vermont, the Commission failed to consider alternative benchmarks set at dollar amounts *between* $28.13 (the amount of the current benchmark) and $18.65 (the amount under the proposed Washington, D.C. benchmark). In particular, Vermont points out that nothing in the Commission's order expressly addresses commenters' proposals to reduce the benchmark to $26.00 or to $26.45. Appellant's Br. 45-47.

Although the Administrative Procedure Act "demands an adequate explanation when . . . alternatives are rejected," *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983), agencies "need not respond to every comment," *id.* at 818 (quotation omitted). Here, the Commission decided that it had no need to change the rural support mechanism at all. As the Commission pointed out, nearly every rural resident has access to telephone service and any increase in subsidies would require customers from around the country to pay more for telephone service. Thus, the Commission determined—reasonably in our view—that *any* reduction in the cost benchmark was unnecessary. Because the Commission adequately explained its decision to keep the cost benchmark at two standard deviations above the national average, its failure to expressly address alternative benchmarks was neither arbitrary nor capricious.

Next, Vermont contends that the Commission failed in its statutory duty to ensure that rural "telecommunications and

information services . . . are reasonably comparable to those services provided in urban areas." 47 U.S.C. § 254(b)(3). In response to this statutory directive, the Commission found that subscribers across the country have access to essentially identical landline, wireless, and Internet-based telephone services. Challenging this conclusion, Vermont cites three items from the administrative record: a letter from former Maine Governor John Baldacci stating that certain parts of Maine "have no or inadequate wireless service," Letter from John E. Baldacci, Governor of Maine, to Hon. Kevin J. Martin, Chair, FCC, WC Docket No. 05-337 (Oct. 7, 2008); comments from Vermont and Maine alleging that, due to the "lack of sufficient federal support" in rural areas, telecommunications companies were "slow to deploy advanced services," Comments of Maine Pub. Utils. Comm'n, et al. at 5, WC Docket No. 05-337 (Jan. 28, 2010); and a declaration from a Senior Advisor at the Maine Public Utilities Commission stating that "rate comparisons alone cannot show that support is sufficient . . . because they say nothing about the sufficiency or level of services that the rates pay for," Reply Decl. on Behalf of Joel Shifman of the Maine Pub. Utils. Comm'n at 5, WC Docket No. 05-337 (June 8, 2009).

We have little trouble rejecting these three items as a basis for questioning the Commission's finding that rural and urban services are in fact "reasonably comparable." The Governor's letter is entirely anecdotal, Vermont and Maine's conclusory comments are unsupported by any data, and the lawyer's declaration simply states the self-evident proposition that rate comparisons cannot be used to demonstrate that services are reasonably comparable. Moreover, the Commission cited empirical data showing that "[e]ven in rural areas, approximately 98.5 percent of the population has access to [wireless] services offered by one or more providers," thus

directly supporting its conclusion that wireless services in rural areas are comparable to those in urban areas. *Order*, 25 FCC Rcd. at 4079 ¶ 15.

Vermont nonetheless contends that because Congress required the Commission to ensure that services are reasonably comparable, the Commission was required to collect information about the quality of services available in rural areas. In response, the Commission explains that since the passage of the Telecommunications Act, it has "reli[ed] upon service quality data provided by the states in combination with those data that the Commission already gathers . . . to monitor service quality trends." Appellee's Br. 52 (emphasis added) (quoting *Federal-State Joint Bd. On Universal Serv.*, 12 FCC Rcd. 8776, 8832 ¶ 100 (1997)). Such a system, the Commission believes, works because most states have enacted their own mechanism to ensure high-quality service within their borders. Accordingly, "additional efforts undertaken at the federal level would be largely redundant." Appellee's Br. 52 (citing *Federal-State Joint Bd. On Universal Serv.*, 12 FCC Rcd. at 8831-32 ¶ 99).

Contrary to Vermont's contention, the Commission has not abdicated its statutory duties by having the states submit service quality data. The relevant provision of the Telecommunications Act requires the Commission to ensure that "[c]onsumers in all regions of the Nation . . . have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas." 47 U.S.C. § 254(b)(3). Nothing in that provision requires—nor even implies—that the Commission itself must collect data on service comparability in any given manner. And, as the Commission quite reasonably explains, and Vermont nowhere disputes, most states already maintain service quality data. If that data reveals quality problems,

states have every incentive to send it on to the Commission. Thus, absent a clear congressional directive that the Commission itself engage in fact-finding, the Commission acted well within its discretion in requiring states to submit service data.

Finally, Vermont contends that even if the Commission's high-cost support mechanism comports with the statute and is supported by empirical evidence, the Commission's use of stale data to calculate subsidies renders that mechanism invalid in practice. To determine the amount of high-cost support a state should receive, the Commission must first calculate the average cost per line—both nationally and within states. To do so, the Commission divides the total amount spent on providing services by the number of telephone lines served. Although the Commission once updated line counts periodically, it last did so in 2002, and since then the number of landlines serviced in rural areas (and across the country) has dropped as many customers have abandoned landline phones altogether in favor of mobile phone services, *Order*, 25 FCC Rcd. at 4078-79 ¶ 14. Because fewer lines serviced means a higher average cost per line, Vermont contends that had the Commission used current data, the rural costs per line may have been higher and thus statewide averages more likely to exceed—and to exceed by a larger amount—two standard deviations above the national average cost.

Acknowledging that it now uses stale line-count data, the Commission contends that updating the data is a labor-intensive process that would take time away from its top priority—implementing the National Broadband Plan and ensuring that all regions of the nation have access to advanced telecommunications technology. Because the National Broadband Plan will overhaul the current Universal Support

Program, the Commission believes it is not worth "expending significant time and resources" to update the current cost model. Doing so, the Commission tells us, would "impede [its] ability to implement the congressionally-mandated National Broadband Plan"—a plan that, once in effect, will replace the current high-cost support mechanisms with funds for universal broadband deployment. Appellee's Br. 45.

Vermont offers us no basis for questioning the Commission's assurance that it is diligently working on implementing the National Broadband Plan nor its judgment that updating line counts would divert resources from that task. In any event, line counts are relevant only insofar as the existing high-cost support program remains in effect. Pursuant to the National Broadband Plan, that program will soon be overhauled to take account of the rapidly shifting technological landscape.

And that's not all. At oral argument, Commission counsel assured us that states potentially disadvantaged by stale line counts are not without recourse. Specifically, they may petition the Commission for supplemental relief under the waiver program by submitting "documentation that unique circumstances prevent the achievement of reasonably comparable rates in that state." *Order*, 25 FCC Rcd. at 4100 ¶ 51. Indeed, Commission counsel called Vermont's challenge to stale line-count data a "perfect use of the waiver process." Oral Arg. Rec. at 41:54. As we have previously held, such a process is a "sign of reasonableness," representing an "exception from the rigors of the broad rule" and thus, an effort by an agency "to cabin, under appropriate circumstances, [a general rule's] potential sweep." *Natural Res. Def. Council v. EPA*, 822 F.2d 104, 120 (D.C. Cir. 1987).

**III.**

The Telecommunications Act's universal service provision requires the Commission to do far more than promote rural rates and services that are "reasonably comparable" to those in urban areas. The Commission must also ensure that "low-income consumers . . . schools and classrooms, health care providers, and libraries…have access to advanced telecommunications services." 47 U.S.C. § 254(b). And in carrying out all these mandates, the Commission must ensure that rates charged to consumers nationwide are "just, reasonable, and affordable." *Id.* As the Commission rightly observed, it has a "responsibility to be a prudent guardian of the public's resources." *Order*, 25 FCC Rcd. at 4088 ¶ 29.

Here, the Commission has explained that "reasonable comparability" between rural and urban areas has been largely accomplished and that expansion of the high-cost support fund will "jeopardize other statutory mandates," such as extending services to schools, hospitals, and libraries, and "ensuring affordable rates in all parts of the country." *Id.* at 4087 ¶ 28. Because of this, and because the Commission has promised to address state-specific issues, like those presented by Vermont and Maine, through the waiver process, its decision to leave the high-cost support mechanism unchanged is neither arbitrary nor capricious. We thus deny the petition for review.

So ordered.