*673 Opinión disidente emitida por el
Juez Asociado Señor Kol-thoff Caraballo,
a la cual se unen los Jueces Asociados Señores Rivera García y Feliberti Cintrón.
En el presente caso me veo precisado a disentir de la Opinión mayoritaria por entender que la Junta Revisora de Permisos y Uso de Terrenos (Junta Revisora) no erró al determinar que QMC Telecom, LLC (QMC) cumplió con el radio de seguridad.
I
Los hechos del caso de epígrafe están muy bien expues-tos en la Opinión del Tribunal, por lo que considero inne-cesario reproducirlos. Así, pasamos a discutir el derecho aplicable a la controversia ante nuestra consideración.
II
A. Ley Núm. 89-2000, (1) según enmendada, mejor conocida como la Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico
El 6 de junio de 2000, la Asamblea Legislativa creó la Ley Núm. 89-2000, supra, para lograr el desarrollo orde-nado, aprovechar al máximo nuestras facilidades de infra-estructuras y evitar el crecimiento exponencial de torres de telecomunicaciones en la Isla.(2) Esta ley adoptó como po-lítica pública el uso integrado de las facilidades de telecomunicaciones.
*674 Por otro lado, la Ley Núm. 89-2000, supra, facultó a la Junta de Planificación (JP) a establecer un reglamento para atemperar la reglamentación vigente hasta ese mo-mento a los propósitos perseguidos por esta ley. Así las cosas, el 23 de julio de 2003 la JP, mediante la Resolución Núm. JP-RP-26-1-2003, derogó su Reglamento Núm. 6064 y lo sustituyó por el Reglamento Núm. 6721, Reglamento para Proyectos de Construcción, Instalación y Ubicación de Torres y Facilidades de Telecomunicaciones, Reglamento de Planificación Núm. 26 de la Junta de Planificación de 19 de noviembre de 2003 (Reglamento de Planificación Núm. 26).(3) Este reglamento perseguía objetivos análogos a los que promueve la Ley Núm. 89-2000, supra.
Tanto la Ley Núm. 89-2000, supra, como el Reglamento de Planificación Núm. 26, buscan armonizar no solo los intereses comerciales, sino también los de los ciudadanos. Como expresa la Opinión de este Tribunal, a los fines de cumplir con el objetivo de “ 'establecer un balance entre los intereses de nuestros ciudadanos y el desarrollo de nues-tras áreas residenciales’ ”, esta ley se encargó de establecer los parámetros que deben regir en el proceso de otorga-miento de permisos de construcción para la edificación de torres de telecomunicaciones.(4) De esta manera se crea un balance entre los avances de la tecnología, en considera-ción al desarrollo ordenado de Puerto Rico y el aprovecha-miento máximo de la infraestructura disponible.
Ahora bien, la Ley Núm. 89-2000, supra, es una ley de *675 telecomunicaciones. Por lo tanto, es menester interpretar sus disposiciones en armonía con los demás estatutos de telecomunicaciones, tanto a nivel federal como local.
B. Ley Federal de Comunicaciones
En el 1934, el Congreso de Estados Unidos aprobó la Ley Federal de Telecomunicaciones, 47 USCA see. 151 et seq. Esta ley proveyó para la creación de la Comisión Federal de Comunicaciones (FCC, por sus siglas en inglés) cuyo propósito primordial era regular el servicio telefónico interestatal.(5) Con relación a los servicios intraestatales, estos eran regulados por las comisiones estatales.(6) Esta ley se creó principalmente para proteger a los consumidores de AT & T, la cual —mediante una política intensa de consolidación— había adquirido un monopolio de todos los segmentos de la industria de las telecomunicaciones.(7) Por varias décadas, la sociedad había percibido a la industria telefónica como un “monopolio natural” que no permitía la competencia, en la que solo existía un proveedor de servicio y la que debía ser reglamentada para el beneficio de los consumidores.(8) Como resultado de esta ideología monopolística, muchos estados permitieron que compañías locales adquirieran un monopolio de los servicios de telecomunicaciones. (9) Sin embargo, a través de los años, con el desarrollo de la industria de telecomunicaciones y con el avance en la tecnología, muchos comenzaron a retar la premisa básica de la teoría del “monopolio natural”. Como resultado de ello, dicha teoría comenzó a deteriorarse y comenzaron a surgir nuevas oportunidades para la competencia. (10)
*676 A tenor de lo anterior, la legislación federal fue objeto de adaptación, de cambios y de modificaciones. Finalmente, el Congreso aprobó la Ley Federal de Telecomunicaciones de 1996 (Ley Federal). Como bien señala la Opinión mayoritaria, mediante esta nueva ley se abrió el mercado de las telecomunicaciones, promoviendo la competencia y estable-ciendo un régimen de desreglamentación para eliminar las barreras de la competencia.(11) Para cumplir con este régimen, la Sec. 253 de la Ley Federal, 47 USCA, prohíbe a los estados legislar para impedir que una entidad provea servicios interestatales o intraestatales.
En cuanto a los servicios móviles, y por razón de los posibles efectos ambientales y de salud asociados a este tipo de antenas, la Ley Federal ocupó el campo. Así, esta ley estableció en 47 USCA sec. 332(c)(7), que ningún estado podrá denegar la construcción de una torre de telecomuni-caciones por los riesgos a la salud que puedan causar las ondas de radio, siempre que estas cumplan con lo dis-puesto por la FCC. Ahora bien, la Ley Federal indicó en la misma sección que no se limitará la autoridad de los esta-dos para decidir sobre la construcción, instalación y ubica-ción de las torres.
Así pues, la Ley Federal recoge lo relacionado a la re-glamentación que pueden establecer los estados en cuanto a servicios móviles. En lo pertinente, dispone:

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
*677 (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
Gi) [...]
(iii) [...]
(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission’s regulations concerning such emissions. (Enfasis nuestro).(12)
Como podemos observar, esta sección dispone que nin-gún estado puede imponer requisitos onerosos que impidan la instalación de servicios inalámbricos.
C. Ley Núm. 213-1996,(13) según enmendada, conocida como Ley de Telecomunicaciones de Puerto Rico de 1996
Como resultado de la aprobación de la Ley Federal, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 213-1996, supra. Esta ley declaró como política pública reconocer el servicio de telecomunicaciones como un servicio cuya prestación persigue un fin de alto interés público, fo-mentar el desarrollo de la infraestructura de las telecomunicaciones, asegurar la disponibilidad del más amplio número de facilidades y asegurar que no existan barreras reglamentarias ni procedimientos administrativos innece-sarios que entorpezcan la competencia en el mercado.(14) Además, propició que se proveyera el servicio universal a un costo justo, razonable y asequible para todos los ciudadanos.(15) De esta manera, la Asamblea Legislativa pretende asegurar que se le dé acceso al servicio de teleco- *678 municaciones a los consumidores en todo Puerto Rico, incluyendo a los de bajos ingresos económicos y los que residen en áreas rurales o en áreas en que sea costoso el acceso a tales servicios.(16)
Así, siguiendo el mismo objetivo de la Ley Federal, la Ley de Telecomunicaciones de Puerto Rico de 1996 (Ley de Telecomunicaciones), en su Art. 1-2, declaró como política pública —en lo pertinente— lo siguiente:
Será la política pública del Estado Libre Asociado de Puerto Rico:

(a) Reconocer el servicio de telecomunicaciones como uno cuya prestación persigue un fin de alto interés público dentro de un mercado competitivo',

(b) que se provea el servicio universal a un costo justo, razonable y asequible para todos los ciudadanos;

........

(e) fomentar la inversión de capital en el desarrollo de la infraestructura de las telecomunicaciones',

(f) asegurar la disponibilidad del más amplio número de posibilidades competitivas en la oferta de servicios y facilida-des de telecomunicaciones',

(g) promover la competencia y utilizar las fuerzas del mer-cado como factor primordial en la determinación de precios, términos, disponibilidad y condiciones de servicio;

(h) propiciar la interconexión y la interoperabilidad entre las compañías de telecomunicaciones;

........

(q) Dar acceso a servicios de telecomunicaciones, razonable-mente comparables a los provistos en áreas urbanas, a los con-sumidores en toda la Isla, incluyendo a los de bajos ingresos y los que residen en áreas rurales o en áreas en que sea costoso el acceso a tales servicios',
(r) garantizar el disfrute del servicio brindado sin temor de interrupciones o interferencias irrazonables [...] (Enfasis nuestro).(17)
En virtud de la política pública antes reseñada, la ley creó la Junta Reglamentadora de las Telecomunicaciones (Junta Reglamentadora) “como la agencia encargada de re- *679 glamentar los servicios de telecomunicaciones en Puerto Rico y de dar cumplimiento y administrar este capítulo”,(18) confiriéndole los poderes y las prerrogativas necesarios para cumplir con dicho propósito.(19) Como esta ley está fundamentada en la normativa federal, la Asamblea Legislativa limitó la jurisdicción de la Junta Reglamentadora a “todo aquello que no esté en conflicto con las disposiciones estatutarias y reglamentarias federales, especialmente las que corresponden a la Comisión Federal de Comunicaciones, así como aquellas normas federales que ocupen el campo”.(20)
III
El Art. 5 de la Ley Núm. 89-2000, supra, 27 LPRA sec. 323, establece que toda torre de telecomunicaciones ubicada en un distrito residencial deberá guardar una distancia no menor de la altura de la torre más un diez por ciento adicional de la residencia más cercana. Sin embargo, y como señala la Opinión mayoritaria, al leer dicha ley y el Reglamento de Planificación Núm. 26, supra, podemos observar que no proveen una definición de qué se entenderá por “residencia” o, más bien, si dicho término incluye aque-llas edificaciones inmediatamente anexas a la estructura principal de la casa. Así las cosas, en ausencia de una definición de “residencia”, es menester recurrir a los principios de hermenéutica para interpretar el estatuto.
Nuestro ordenamiento jurídico establece que al analizar una ley se debe acudir primero al propio texto, pues si el lenguaje es claro y libre de ambigüedad, no debe ser me- *680 nospreciado bajo el pretexto de cumplir con su espíritu.(21) No obstante, cuando existe alguna ambigüedad en la ley, esta debe interpretarse de manera que tal interpretación cumpla con el propósito legislativo.(22)
A tenor de lo anterior, entiendo que la mayoría de este Tribunal se equivoca al interpretar la ley sin analizar el propósito legislativo por el cual se incluyó la palabra “resi-dencia” en el texto de esta. La Opinión mayoritaria se cir-cunscribe a la definición de “residencia” y “terraza” que re-gistra el Diccionario de la Real Academia Española. Así, yerra la mayoría al obviar que los estatutos cardinales a esta controversia son particulares de una industria. Por lo tanto, sus términos deben interpretarse bajo el crisol de la intensión del legislador, dirigida a cumplir con las necesi-dades de dicha industria, en este caso, las telecomunica-ciones.
En primer término, la Opinión mayoritaria no hace un análisis del propósito por el cual se creó la Ley Núm. 89-2000, supra, ni la intención que tuvo el legislador al incluir la palabra “residencia” en el texto de la ley, en vez de “propiedad” o “colindancia”. Aunque bien es cierto que la pala-bra de una ley debe ser entendida en su más corriente y usual significado,(23) es claro también que tal significado, en buena hermenéutica jurídica, no puede, en aras de lo cotidiano, escabullirse de aquello que se ajusta, en estricta lógica, a lo que el legislador pretendió.
Por lo tanto, en el caso de autos nos correspondía encon-trar la voluntad del legislador y llenar el vacío utilizando las leyes de telecomunicaciones como marco de referencia y analizando el propósito por el cual se creó la Ley Núm. 89-2000, supra. Veamos.

*681
El aspecto de la seguridad en la Ley Núm. 89-2000

Para poder evaluar en su justa perspectiva la determi-nación de la Junta Revisora en este caso, es menester ini-ciar el análisis de la controversia enmarcándola en el con-texto del propósito que persigue el Art. 5 de la Ley Núm. 89-2000, supra, y la Sec. 3.02 del Reglamento de Planifica-ción Núm. 26, supra, pues fue exclusiva y expresamente a base de estas que la agencia definió el término “residencia”. Es claro que ambas disposiciones tienen como propósito el que se establezca un radio de seguridad entre una torre de telecomunicaciones y las residencias aledañas.
Así, ambos preceptos disponen que una torre de telecomunicaciones ubicada en un distrito residencial o rural deberá guardar una distancia no menor de la altura de la torre más un diez por ciento adicional de la residencia más cercana. En particular, el Art. 5 de la ley, supra, establece:
(a) Excepto como más adelante se dispone la construcción de toda torre de telecomunicaciones en un distrito residencial o rural, según las clasificaciones de la Junta de Planificación o de los Municipios Autónomos autorizados a emitir dichas cla-sificaciones, por la Junta de Planificación conforme a [la Ley de Municipios Autónomos], deberá guardar una distancia no menor de la altura de la torre, más un diez por ciento (10%) adicional de la residencia más cercana. Este requisito no será de aplicación si el incumplimiento con las disposiciones de [esta ley] no fue creado por el dueño de la torre y sí por desa-rrollos posteriores autorizados por la Junta de Planificación, en cuyo caso la torre podrá permanecer en su ubicación original. Se permitirá la ubicación de una torre que no cumpla con lo establecido en este inciso en aquellos casos donde el dueño de la torre y la residencia más cercana sea un mismo titular o, aún siendo dueños distintos, el titular de la residen-cia permita por declaración jurada la ubicación de la torre en el lugar propuesto siempre que no haya otra residencia exis-tente dentro del radio de distancia dispuesto por esta Ley que no haya consentido dicha ubicación mediante declaración jurada.
........
(f) Toda torre de telecomunicaciones que esté ubicada en un distrito que no sea residencial o rural deberá mantener una *682 distancia mínima desde la toire hasta la estructura más cer-cana de quince (15) metros. (Énfasis y corchetes suplidos y en el original).
Ahora bien, tanto la Exposición de Motivos de la Ley Núm. 89-2000, supra, como el Art. 3 (declaración de polí-tica pública)(24) son claros en establecer que su Art. 5 se refiere a la seguridad física del ser humano que pudiera encontrarse bajo esa estructura que llamamos “resi-dencia”. La Exposición de Motivos señala lo siguiente:
Durante la emergencia ocurrida en el país con motivo del paso del Huracán Georges el pasado 21 de septiembre de 1998, tuvimos la experiencia en distintos lugares de Puerto Rico de torres que colapsaron debido a las fuerzas de los vientos hu-racanados que azotaron a nuestra isla. Hasta el momento no ha ocurrido ninguna desgracia en la que se vean afectadas las vidas de las personas aunque el peligro siempre estará latente mientras una torre esté ubicada dentro del radio de una residencia. Esta Ley tiene como finalidad regular la construc-ción de las referidas torres y ala vez proteger la seguridad de nuestros ciudadanos. (Énfasis nuestro).(25)
Por otro lado, el Art. 3(c) de la ley señala lo siguiente:
(c) La proliferación de torres que albergan antenas en zonas urbanas o en las cercanías de residencias crea desasosiego y temor por la seguridad y vida de dichos titulares [...] (Énfasis suplido). (26)
Es importante recalcar que aunque la Ley Núm. 89-2000, supra, abarca otros aspectos relacionados con la ubi-cación de una torre de telecomunicaciones —como, por ejemplo, la estética — , cuando menciona la seguridad de las propiedades se refiere a la seguridad del ciudadano que se encuentre dentro de esa residencia cuando pudiera colap-sar una torre de telecomunicaciones. En ese contexto, el riesgo de un peligro se encuentra limitado al ámbito del ser *683 humano que reside o pudiera encontrarse dentro de la pro-piedad (residencia), y no a la propiedad en sí.
Con esta visión y enfoque coincidió en su alegato la Ofi-cina de la Procuradora General. De hecho, durante la vista oral que se celebrara en este caso, la Procuradora General, Hon. Margarita Mercado Echegaray, insistió, en síntesis, que el requisito de radio de seguridad que establece el Art. 5 de la ley, supra, se refiere a la seguridad de los resi-dentes.
Por otro lado, al hablar de seguridad nos referimos ne-cesariamente al riesgo de un daño que en mayor o menor grado sea real, pues nadie razonablemente busca protec-ción de aquello que no tiene la posibilidad de producirnos un perjuicio. Es por eso que, como corolario de todo lo anterior, precisamos entonces contestarnos las preguntas si-guientes: ¿cuánto riesgo físico en realidad constituye para un ciudadano una torre construida con las condiciones del caso de autos?; ¿cuán real es para el propio legislador tal riesgo?
Primeramente, notemos que el Art. 5 de la Ley Núm. 89-200, supra, establece que ninguna torre de comunica-ción puede construirse —sin el aval de los residentes cer-canos— a una distancia menor que el tamaño de la propia torre. En realidad, la disposición de por sí inicia estable-ciendo que las residencias aledañas estarán fuera del radio de caída de la torre. Pero, además, y para minimizar aún más el riesgo, el artículo en cuestión establece un margen de error de 10% adicional al tamaño de la torre. De esta forma, una torre que colapsa, por ejemplo, de forma total-mente horizontal —lo que, como veremos más adelante, no se supone que ocurra— en su caída tendría que también moverse totalmente de su base para que pueda hacer con-tacto con una residencia.
Sin embargo, nótese que, aún en el supuesto anterior, todavía existiría el 10% de margen de error adicional. Más aún, y como fue ampliamente argumentado durante la *684 vista oral, estas torres de telecomunicaciones, por razón de la ingeniería y las especificaciones con las cuales están construidas, se diseñan para colapsar sobre ellas mismas hacia abajo y no a lo largo. Así se ha determinado en múl-tiples jurisdicciones de Estados Unidos.(27) En todas estas jurisdicciones los tribunales entendieron que quedó probado que las torres de telecomunicaciones están diseñadas para colapsar en pedazos sobre ellas mismas.(28) Por otro lado, en el 2000, el Tribunal de Apelaciones para el Cuarto Circuito resolvió el caso Petersburg Cellular Partnership v. Board of Sup’rs of Nottoway County, 205 F.3d 688 (4to Cir. 2000). Una de las controversias en ese caso era precisa-mente la preocupación de la ciudadanía de que la torre de telecomunicaciones colapsara. En cuanto a esto, el tribunal resolvió que quedó demostrado que
[T\he tower was designed to collapse on itself, thus presenting no danger to no one. (Énfasis suplido).(29)
Por otro lado, notemos que el Art. 5 de la Ley Núm. 89-2000, supra, no prohíbe que cualquier persona construya dentro del radio de seguridad de una torre. Esto es, una persona puede construir para él y su familia una residencia que no cumpla de forma alguna con el requisito de seguridad que establece esta disposición. De igual manera, basta con que los vecinos cuyas residencias se encuentran dentro del radio de seguridad avalen bajo declaración ju-rada la construcción de una torre para que entonces se pueda también obviar por completo este requisito. Lo anterior demuestra que aunque el legislador se preocupó por el riesgo que pudiera representar la construcción de estas *685 torres para la seguridad física de los residentes de una comunidad, a su vez acepta que tal riesgo en realidad es mínimo. De otra manera, ¿cómo podrían entenderse tales excepciones a riesgo de la seguridad física de adultos y niños?
Determinado entonces que el riesgo real para los vecinos aledaños a una torre de comunicaciones —considerando la manera como se construyen estas torres y con-forme lo que claramente puede interpretarse de la ley— es mínimo, nos corresponde dar contenido a la palabra “residencia” contenida en el Art. 5 de la Ley Núm. 89-2000, supra. Esto en el contexto, además, de que esa ley es un estatuto de telecomunicaciones subordinado en sus disposiciones a la Ley Federal y que debe, a su vez, interpretarse en armonía con la Ley de Telecomunicaciones de Puerto Rico, infra.
En primer lugar y como mencionáramos anteriormente, el servicio de telecomunicaciones es de alto interés público. Al analizar la Ley Federal y la Ley de Telecomunicaciones de Puerto Rico vemos que fomentan el acceso y disfrute de todos los ciudadanos a los servicios de telecomunicaciones. Así pues, estas leyes se crearon para eliminar barreras reglamentarias innecesarias y simplificar los demás requerimientos reglamentarios.(30) El propósito de la desreglamentación establecida en estas leyes es asegurar la disponibilidad del más amplio número de facilidades de telecomunicaciones.
Tanto el gobierno federal como el gobierno estatal han establecido políticas y objetivos para el desarrollo de los servicios de bandas anchas. A estos efectos y como ejemplo, la FCC adoptó el programa conocido como “National *686 Broadband Plan”, en el cual establece las prioridades federales de telecomunicaciones.(31) En síntesis, este programa tiene como objetivo el que se establezcan redes inalámbricas más rápidas y de mayor alcance a través de todo el País y sus territorios, proveyendo ese servicio a la mayor canti-dad de viviendas y personas con acceso a conexiones de banda ancha económicas y de clase mundial.(32) Es por esto que se han permitido las instalaciones de torres de telecomunicaciones en áreas residenciales, para así poder expandir la cobertura y asegurarse que todos los ciudadanos, no importa donde vivan, reciban el servicio. Para cumplir con estos objetivos, se crearon estas leyes eliminando toda barrera reglamentaria innecesaria al desarrollo de las torres de telecomunicaciones.
Considerando todo este marco referencial, nos correspondía interpretar cómo definió o, mejor aún, qué quiso incluir el legislador cuando usó el término “residencia” en el Art. 5(a) de la mencionada ley, supra, al referirse al lugar protegido por el radio de seguridad. Como mencionáramos, al interpretar dicho término debíamos analizar todas las disposiciones de las leyes pertinentes armonizándolas con el objetivo de seguridad y el balance que busca salva-guardar y proteger la Ley Núm. 89-2000, supra. Así las cosas, equilibrando lo dispuesto en dicha ley con las leyes de telecomunicaciones antes mencionadas e interpretando la ley como un texto íntegro, el radio de seguridad estable-cido en la Ley Núm. 89-2000, supra, busca proteger la re-sidencia y la seguridad de los ciudadanos que se resguar-dan en ella durante eventos atmosféricos. Por lo tanto, resulta forzoso determinar que el legislador se refería a la *687 “estructura residencial”y no a la propiedad ni a las estruc-turas accesorias, como lo son la terraza, los columpios, las estructuras de almacenamiento e invernaderos; estas no son estructuras en que las familias puertorriqueñas se re-fugian para buscar protección durante un evento atmosférico. Conforme al contexto de la legislación y la in-tención del legislador, no podíamos encontrar otra posible interpretación a la palabra “residencia”.
Por otro lado, establecer requerimientos mayores a los dispuestos en la Ley Núm. 89-2000, supra, es incumplir con la política pública desregulatoria antes mencionada y limitar la disponibilidad de terrenos adecuados para la ins-talación de torres de telecomunicaciones. Al interpretar “residencia” como la estructura residencial, más toda es-tructura accesoria, se hace casi imposible instalar torres de telecomunicaciones en distritos residenciales. Esto tiene el efecto de afectar la habilidad de las compañías de teleco-municaciones de proveer a los ciudadanos costos más jus-tos, razonables y asequibles. Como resultado, entiendo que la construcción e instalación de torres de telecomunicacio-nes se tornará más onerosa, esto en contra de los objetivos de la Ley Federal y de la Ley de Telecomunicaciones de Puerto Rico de 1996, ya que será más difícil llevar los ser-vicios de telecomunicaciones a todos los ciudadanos.
En vista de todo lo anterior, la definición establecida por la Junta Revisora al término en controversia se ajustaba al Derecho.
IV
Según los fundamentos expuestos, QMC cumplió con el radio de seguridad establecido en la Ley Núm. 89-2000, supra. La distancia del radio de seguridad se debía medir desde el centro de la ubicación de la torre hasta la residen-cia más cercana, entendiéndose por “residencia” la estruc-tura principal sin aquellas accesorias como terraza, mar- *688 quesina, patio, columpios, edificaciones para almacena-miento, entre otras. Por lo tanto, entiendo que la residen-cia de la peticionaria se encuentra fuera del radio de seguridad.
V
Por todo lo anterior, disiento respetuosamente del curso de acción seguido por la mayoría de este Tribunal y, en consecuencia, confirmaría la resolución de la Junta Revi-sora de Permisos y Uso de Terrenos.

 27 LPRA sec. 321 et seq.

 Véase Exposición de Motivos de la Ley Núm. 89-2000, supra, 2000 (Parte 1) Leyes de Puerto Rico 699.

 Cabe destacar que el Reglamento para Proyectos de Construcción, Instalación y Ubicación de Torres y Facilidades de Telecomunicaciones Núm. 6721, Reglamento de Planificación Núm. 26 de la Junta de Planificación de 19 de noviembre de 2003 (Reglamento de Planificación Núm. 26) fue derogado en virtud del Reglamento Conjunto de Permisos para Obras de Construcción y Usos de Terrenos, Núm. 7951, Reglamento Núm. 31 de la Junta de Planificación de 30 de noviembre de 2010 (Reglamento de Planificación Núm. 31). No obstante, puesto que tanto el proceso sobre el permiso de construcción de QMC Telecom, LLC (QMC) como la resolución emitida por la Oficina de Gerencia de Permisos (OGP) tuvieron lugar con anterioridad a la efectividad del Reglamento de Planificación Núm. 31, el reglamento aplicable a la controversia ante nuestra consideración es el Reglamento de Planificación Núm. 26.

 Véase Exposición de Motivos de la Ley Núm. 89-2000, supra, 2000 (Parte 1) Leyes de Puerto Rico 699. Véase Opinión mayoritaria, pág. 670.

 P.R.T.C. v. J. Reg. Tel. de P.R., 151 DPR 269, 279 (2000).

 Íd.

 Íd., págs. 278-279.

 Íd., pág. 279.

 Íd.

 Íd., citando a G.J. Guzzi, Breaking Up the Local Telephone Monopolies: The Local Competition Provisions of the Telecommunications Act of 1996, 39 B.C.L. Rev. 151 (1997).

 Véase Opinión mayoritaria, pág. 663.

 47 USCA sec. 332(c)(7).

 27 LPRA sec. 265 et seq.

 Clases A, B y C v. PRTC, 183 DPR 666, 675 (2011); Claro TV y Junta Regl. Tel. v. OneLink, 179 DPR 177, 188-189 (2010); Caribe Comms., Inc. v. P.R.T.Co., 157 DPR 203, 216-218 (2002).

 Claro TV y Junta Regl. Tel. v. OneLink, supra; Caribe Comms., Inc. v. P.R.T.Co., supra.

 Íd.

 27 LPRA sec. 265.

 Véase Cap. II, Art. I de la Ley Núm. 213-1996 (27 LPRA sec. 267); Caribe Comms., Inc. v. P.R.T.Co., supra, págs. 218-219.

 Caribe Comms., Inc. v. P.R.T.Co., supra; P.R.T.C. v. J. Reg. Tel. de P.R., supra, pág. 280.

 Véase Claro TV y Junta Regl. Tel. v. OneLink, supra, pág. 196; 27 LPRA sec. 267e(a).

 Art. 14 Código Civil de Puerto Rico, 31 LPRA sec. 14.

 Morales et als. v. Marengo et al., 181 DPR 852, 859 (2011).

 Art. 15 del Código Civil de Puerto Rico, 31 LPRA sec. 15.

 27 LPRA sec. 321 n.

 Véase Exposición de Motivos de la Ley Núm. 89-2000, supra, 2000 (Parte 1) Leyes de Puerto Rico 698.

 27 LPRA sec. 321 n.

 Véanse: Bevivino v. Town of Mount Pleasant Bd. of Zoning Appeals, 402 S.C. 57, 65 (2013); USCOC of New Hamphire RSA #2, Inc. v. City of Franklin, N.H., 413 F.Supp.2d 21, 31 (D. N.H. 2006); Group EMF, Inc. v. Coweta County, 131 F.Supp.2d 1335, 1340 (N.D. Georgia 2000); Iowa Wireless Services, L.P. v. City of Moline, Ill., 29 F.Supp.2d 915, 921 (C.D. Ill. 1998).

 Íd.

 Petersburg Cellular Partnership v. Board of Sup’rs of Nottoway County, 205 F.3d 688, 696 (4to Cir. 2000).

 Clases A, B y C v. PRTC, supra, pág. 675; Claro TV y Junta Regl. Tel. v. OneLink, supra, pág. 190; Caribe Comms., Inc. v. P.R.T.C., supra, pág. 217; P.R.T.Co. v. J. Reg. Tel. de P.R., supra, págs. 279-280. Véanse, además: 47 USCA sec. 253; Qwest Communications Corp. v. City of Berkeley, 146 F.Supp.2d 1081, 1096-1097 (N.D. Cal. 2001); TCG Detroit v. City of Dearborn, 206 F.3d 618 (6to Cir. 2000); AT & T Corp. v. Iowa Utilities Bd., 525 US 366 (1999); AT & T Communications of Southwest, Inc. v. City of Dallas, 8 F. Supp. 2d 582, 587 (N.D. Texas 1998).

 The National Broadband Plan, en: http.//www.broadband.gov/plan/ (última visita, 13 de agosto de 2013). Véase, además, Federal Communications Commission, Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers, 26 FCC Red. 4554 (2011).

 Íd. Véase, además, Vermont Public Service Bd v. F.C.C., 661 F.3d 54 (D.C. Cir. 2011).